Argued March 11, decided May 12, rehearing denied November 17, 1908.

## OREGON v. PORTLAND GEN. ELEC. CO.

[95 Pac. 722; 98 Pac. 160.]

PLEADING—"DEMURRER"—ORDER SUSTAINING—EFFECT.

1. A demurrer is a part of the proceedings by which a cause is put at issue and the order sustaining it eliminates from the pleading the matter demurred to.

APPEAL—RULING ON DEMURRER—REVIEW.

2. Under Section 557, B. & C. Comp., providing that, on appeal, the appellate court may review any intermediate order involving the merits or affecting the judgment appealed from, a ruling sustaining a demurrer my be reviewed on appeal from the final judgment.

PLEADING—DEMURRER—GROUNDS.

3. Under Section 69, B. & C. Comp., providing that a demurrer may be taken to the whole complaint, or to any of the alleged causes of action stated therein, a demurrer is not available to question any part of a pleading less than a cause of action, and it cannot attack a part of the recovery sought by a complaint stating as one cause of action, matters constituting several causes, on the ground that the prayer demands too much.

PLEADING — COMPLAINT — SEPARATELY STATING CAUSES OF ACTION — WAIVER.

4. Under Section 106, B. & C. Comp., providing that, when a pleading contains more than one cause of action and the same is not pleaded separately, the pleading may on motion be stricken out, etc., a defendant desiring to take advantage of the fact that a complaint states as one cause of action, matters constituting several causes, must do so by motion to strike, or the error is waived, and the complaint must be treated as setting forth one cause of action.

SAME.

5. Under Section 68, B. & C. Comp., providing that defendant may demur to the complaint when it appears on the face thereof, that the action has not been commenced within the time limited, a demurrer cannot attack a part of the recovery sought by a complaint stating a good cause of action for a part of

the claim sued on, but the amount of the recovery must be determined at the trial.

### Canals—Public Aid—Trust Relation—Creation.

6. Act October 21, 1870 (Laws 1870, p. 14), appropriating funds to a company for the construction of a canal and locks on condition that the company shall pay to the State a specified per cent. of the net profits arising from the tolls collected from freight and passengers passing through the canal and locks, etc., does not make the company a trustee of the State for the specified per cent., but the same is the money of the company due as a debt to the State.

### Limitations of Actions—Claims Due State.

7. Under Section 13, B. & C. Comp. providing that limitations shall apply to actions in the name of the State for its benefit, all suits by the State, whether in its sovereign or proprietary capacity, may be barred by limitations and limitations run against a liability created by a statute requiring a company operating a canal to pay to the State a specified per cent. of the tolls received.

### Eminent Domain—Right to Exercise

8. The right granted to a corporation to exercise the power of eminent domain is available only when a public interest is to be served, and when the exercise of the power is necessary to enable the corporation to carry out the purpose of its organization, and it does not transfer to the corporation the title or use of any public property, rights, or easements.

### Corporations—Organization—Powers—Franchises—Statutes.

9. A corporation organized under Sections 5052-5075, B. & C. Comp. (Deady's Gen. Laws, p. 658, c. 8), providing what the certificate of incorporation shall specify, defining what the powers of a corporation shall be without granting any franchise other than the right to incorporate, and declaring that any corporation "formed for the purpose of navigating any stream * * may * * construct any '' '' canal '' * as if such corporation had been specifically formed for such purposes," and authorizing corporations to enter into possession of property, etc., possesses no franchise to construct and operate a canal and locks as part of a navigable river, and to take tolls thereon, which rights are franchises which cannot be excercised without permission from the State.

### Same.

10. A corporation may take advantage of the privileges and franchises granted by the general law of incorporation by including in its articles of incorporation any of the privileges and franchises it may desire to exercise, and to that extent the articles stand as the legislative charter thereof, but it cannot exercise powers or privileges not enumerated therein, and can exercise no power not authorized by statute, though enumerated therein.

### Franchises—Construction.

11. Grants of franchises are strictly construed against the grantee, and nothing passes by implication.

### Canals—Right to Operate.

12. The right to construct and operate a canal and locks as a part of a navigable river and to take tolls thereon is an undertaking, the exercise of which belongs exclusively to the State or to those to whom it may delegate it, and it is not one of common right, and is subject in the hands of the delegated agent of the State to any restrictions that may be imposed by the State.

### Navigable Waters—Title of Upland Owners.

13. An upland owner of land bordering on a navigable stream owns only to the high-water line, and the stream and the river and its banks and bed belong to the State.

EVIDENCE—JUDICIAL NOTICE.

14. The court will take judicial notice of the fact that a corporation could acquire rights in the bed, banks, and water of a navigable river only by an act of the legislature, so that one constructing and operating a canal built on land owned in fee, with the exception that the canal at both ends reach navigable water, could only do so under a franchise from the State.

CANALS—CONSTRUCTION—DEDICATION TO PUBLIC.

15. Where a corporation accepted the franchise granted to it to construct a canal and locks and constructed the same principally on land which it owned in fee, the land became a part of the highway to the same extent it would have done if originally owned by a stranger and the corporation had acquired it by the right of eminent domain; the act of the corporation being equivalent to a dedication.

SAME.

16. A corporation was organized to construct a canal and locks as a part of a navigable river. Act October 21, 1870 (Laws 1870, p. 14), authorized the corporation to operate the canal and locks, limited the rate of toll, exacted a payment to the state of a specified per cent. of the profits from tolls, and reserved the rights of the State, at the expiration of a specified period, to appropriate the canal and locks on paying therefor. *Held*, that the act conferred on the corporation a franchise to operate the canal and locks, including the right to appropriate the bed and banks of the river so far as needed, and to divert the water necessary for its purpose.

CORPORATIONS—POWERS—TRANSFER OF FRANCHISE.

17. A corporation to which a franchise has been granted with no power to transfer, has no power to transfer it, and a transfer is void, and does not relieve the franchise of any of the burdens imposed by the act of its creation.

CANALS—POWERS OF CORPORATION.

18. Under Section 5056, subds. 4, 7, B. & C. Comp., authorizing corporations to purchase and dispose of real estate necessary and convenient to carry into effect the objects of the corporation, and providing that a corporation incorporated to construct and operate a railroad, may purchase a railroad constructed by any other company, etc., does not authorize a corporation organized to construct a canal and locks and possessing a franchise to operate the same and charge tolls therefor to transfer the franchise.

SAME.

19. A corporation possessing a franchise to construct and operate a canal and locks subject to Act October 21, 1870 (Laws 1870, p. 14), requiring it to pay a part of its tolls to the State, transferred the franchise without legislative authority. Act October 19, 1876 (Laws 1876, p. 14), subsequently enacted, made no change in the original liabilities and obligations of the corporation and referred to "any and every person, corporation, company, * * either having authority to charge or control of or owning or claiming to own or having any interest in" the canal and locks. Subsequent acts contained provisions only lessening expense to the State and to aid it in securing the fulfillment of the act of 1870. *Held* that, though the act of 1876 be construed as recognizing the transfer, it could not be construed as recognizing a transfer free from the obligations imposed by the act of 1870 and the transferee was subject to such liabilities.

"FRANCHISE"—WHAT CONSTITUTES.

20. A franchise is an incorporeal hereditament, a privilege or authority vested in certain persons by grant of the State to exercise powers or to do and perform acts which without such grant they could not do or perform. It does

not involve an interest in land, and is a privilege which may be owned without the acquisition of realty, and the use of a franchise may require the occupancy, or even the ownership of land without making the franchise itself an interest in land.

CANALS—TOLLS—RIGHTS OF STATE.

21. Act October 21, 1870, (Laws 1870, p. 14), appropriating money to a corporation organized to construct a canal and locks, authorized it to operate the same, and required it to pay a specified part of the tolls to the State. The corporation without legislative authority transferred the franchise. A subsequent act, though acquiescing in the transfer, did not waive the benefits arising to the State under the act. For many years the officers of the State made no efforts to collect the tolls due to the State. *Held*, that the laches of the officers did not operate as a waiver of the continuing liability for a share of the profits or a recognition of the transferee's ownership of the property and franchise free from the burdens imposed.

ESTOPPED—ESTOPPEL IN PAIS.

22. Estoppel *in pais* against the State will not arise from the laches of its officers.

SAME—NATURE OF "ESTOPPEL BY CONDUCT."

23. To constitute estoppel by conduct, there must be a false representation made with knowledge of the facts, and with the intent that it should be acted on by the other party, who was ignorant of the truth, and who was induced to act on the representation.

CANALS—TOLLS—RIGHTS OF STATE.

24. Act October 21, 1870 (Laws 1870, p. 14), required a corporation authorized to construct and operate a canal and locks as a part of a navigable stream to pay to the State a specified per cent. of the tolls collected. The corporation without legislative authority transferred the franchise to a transferee. Subsequent acts, though acquiescing in the transfer, did not waive the rights of the State under the act of 1870. For many years the officers of the State made no effort to collect any of the tolls. The corporation and the transferee did not question the right of the State to its share of the tolls. *Held*, that the State was not estopped from collecting its share of the tolls.

CONSTITUTIONAL LAW—DUE PROCESS OF LAW.

25. Where a corporation acquired property subject to a specified burden imposed by the State, the enforcement by the State of the burden did not take the property of the corporation without due process of law, in violation of the fourteenth amendment of the Federal Constitution.

STATUTES—TITLE—SUFFICIENCY.

26. The title of Act October 21, 1870 (Laws 1870, p. 14), entitled, "An act to appropriate funds for the construction of a steamboat canal at" a designated place, is sufficiently broad, within Constitution Article IV, § 20, providing that every act shall embrace but one subject and matters properly connected therewith, to embrace a provision for the payment to the State of a specified per cent. of the net profits of the tolls collected by the corporation authorized to construct and operate the canal as a condition, on which the State appropriated funds for the construction of the canal.

SAME.

27. Where the provisions of a statute relate directly or indirectly to the same subject, and are actually connected with the subject expressed in the title, the statute is not in conflict with Constitution Article IV, § 20, providing that every act shall embrace but one subject and matters properly connected therewith.

CONSTITUTIONAL LAW—VALIDITY OF STATUTES—RIGHT TO CONTEST.

28. A corporation accepting the benefits of an act and acting on it for several years cannot question its validity.

SAME.

29. A corporation purchasing the property and franchises of another corporation not entitled to question the validity of an act the benefit of which it has accepted and under which it has acted for several years, is estopped from questioning the validity of the act.

NAVIGABLE WATERS — WILLAMETTE RIVER — BED AND BANKS —"PUBLIC HIGHWAY."

30. The Willamette River, being navigable, is a public highway, and title to the bed and banks is in the State, for the benefit of the public.

NAVIGABLE WATERS—IMPROVEMENT—RIGHTS OF STATE.

31. The State may improve a navigable stream, either itself, or by delegation of authority to another.

NAVIGABLE WATERS—IMPROVEMENT OF STREAM—RIGHT OF CORPORATION.

32. Without specially delegated authority from the State, a corporation, by filing articles reciting a purpose to improve a navigable stream, cannot acquire authority to do so, or to collect tolls for the use of the improvements.

NAVIGABLE WATERS—NAVIGABLE STREAM—IMPROVEMENT.

33. The right to improve a navigable stream is a franchise which, unless authorized by general statutes, under which a corporation was organized, is not acquired by an act of incorporation.

CORPORATIONS—ARTICLES OF INCORPORATION—AMENDMENT.

34. Laws 1870, p. 14, appropriating funds to a corporation for the construction of a canal and locks in a navigable stream, was a special grant of a franchise to the corporation, which could not be acquired by specification in the corporation's articles, and was therefore not an amendment of such articles. *Held*, that the act was not in violation of Constitution of Oregon, Article XI, § 2, prohibiting the creation of corporations, other than municipal, by special law.

NAVIGABLE WATERS — IMPROVEMENT—LOCKS—TOLLS—FRANCHISES—CONSTRUCTION—"DUTY TO CONSTRUCT"—"CHARGE GREATER RATE."

35. Laws 1870, p. 14, appropriated funds to a corporation for the improvement of the Willamette River, Section 2 providing that it should be the duty of the corporation to construct a canal and locks, and, after completion, to pass without delay all steamboats at a charge not greater than 50 cents a ton. *Held*, that the term "duty to construct" was more comprehensive than a grant of authority, while including it, and that the requirement that the company should not "charge a greater rate" than 50 cents .a ton was equivalent to authority to charge such rate.

FERRIES—FRANCHISE—RIGHTS OF CORPORATION.

36. No corporation, by virtue of its articles, could acquire a ferry franchise, which could be conferred only by a special grant of the State, in the absence of a general statute covering the case.

EVIDENCE—JUDICIAL NOTICE.

37. Where a corporation was given a franchise to construct a canal and certain toll locks in a navigable river, the court would take judicial notice that it could acquire a fee simple to such property only by legislative grant.

NAVIGABLE WATERS–BOUNDARY—"MEANDER LINE."

38. The point to which the water of a navigable stream usually rises, in an ordinary season of high water, is the "meander line" which forms the boundary of the title of the government.

NAVIGABLE WATERS—SHORE OWNER—EXTENT OF TITLE.

39. The owner of uplands on a navigable stream takes title only to high-water mark.

NAVIGABLE WATERS — IMPROVEMENT COMPANIES — AMENDMENT OF ARTICLES.

40. Where, after the organization of a corporation, it was authorized by Laws 1870, p. 14, to improve a navigable river, the articles of a corporation subsequently organized to succeed to said franchises, did not create in it a new or independent franchise on the river, but it took only the franchises originally conferred on its predecessor, with the same burdens as had been previously imposed.

NAVIGABLE WATERS—IMPROVEMENT OF STREAM—FRANCHISES–PROFITS— PARTICIPATION BY STATE.

41. Laws 1870, p. 14, authorizing a corporation to create a canal and locks for the improvement of the Willamette River, and requiring payment of 10 per cent. of the net profits derived from the use of the canal and locks for the benefit of the State, does not depend for its validity on legislative authority to appropriate such profits to the school fund; the State being authorized to exact a share of the profits as a burden on the franchise.

From Multnomah: ARTHUR L. FRAZER, Judge.

Statement by MR. JUSTICE EAKIN.

As disclosed by the amended complaint, this is a suit brought by the State against the defendant, as successor in interest of the Willamette Falls Canal & Lock Co., which we shall hereafter refer to as the "first company," to recover the 10 per cent of the net profits arising from tolls collected on the canal and locks at Oregon City, as provided by an act of the legislature of the year 1870.

On September 14, 1868, the first company incorporated for the purpose of constructing a canal and locks at, and on the west side of, the Willamette Falls, and on October 21, 1870, the legislative assembly of the State of Oregon passed an act entitled "An act to appropriate funds for the construction of a steamboat canal at the Willamette Falls," which we shall hereafter refer to as the act of 1870 (Laws 1870, p. 14), the preamble to which is as follows:

"Whereas, the Willamette Falls Canal and Lock Co. was duly incorporated under the laws of Oregon, on the

14th day of September, 1868, for the purpose of con-
structing a canal and locks at and on the west side of
the Willamette Falls; and, whereas, it is of great import-
ance to the people of Oregon that the obstructions to the
free navigation of the Willamette river at that place
should be removed, and freights carried on said river
should be cheapened; therefore, be it enacted.     *   *   "

Section 1 of the act agrees to pay to the said company
the sum of money in the act afterwards specified.   Sec-
tions 2 and 3 provide the following:

"Sec. 2. In order to entitle the said corporation to
receive the sum of money hereby agreed to be paid, it
shall be the duty of said corporation to construct a canal
and locks at and on the west side of the Willamette
Falls; the said lock to be not less than one hundred and
sixty feet in length, and forty feet in width, and to be
constructed chiefly of stone, cement and iron, and other-
wise built in a durable and permanent manner; the said
canal and locks to be completed on or before the first day
of January, 1873.   And after the completion of the same,
the said corporation shall pass without delay through
the said canal and locks, all steamboats, flatboats, barges
and other water craft, in the order in which they shall
arrive at either terminus of the canal.

Sec. 3. The State of Oregon agrees to pay the said sum
of money upon the express condition that the said corpor-
ation, after the completion of the said canal and locks,
as hereinafter set forth, shall not charge a greater rate
of tolls than fifty cents per ton for freight, and ten cents
for each passenger, going through said canal and locks
in steamboats or other water craft.   And at the expira-
tion of 20 years from the time said canal and locks are
completed, the State of Oregon shall have the right and
privilege to take and appropriate to its own use forever,
the said canal and locks, upon the payment to the said
corporation the actual value thereof, at the time of tak-
ing and appropriating the same, which value shall be
ascertained in such manner as the legislative assembly
of Oregon may hereafter prescribe."

Section 4 provides that the company shall execute to
the State by January 1, 1873, a bond in the sum of
$300,000, conditioned for the faithful construction of

said canal and locks, and provides that the State shall issue its interest-bearing bonds for $200,000 to the company, payable to it or its assigns on or before 10 years.

Section 5 provides the following:

"The faith of the State of Oregon is hereby pledged so to administer said funds as to make them available at the earliest period, for the payment of said bonds by this act authorized to be issued, upon the express condition that said corporation shall construct said canal and locks in the manner before provided in this act, and not charge a greater rate of tolls than is herein set forth. And it is further provided that the issuance and payment of said bonds shall be made upon the express condition that said corporation shall pay to the State of Oregon ten per centum of the net profits arising from the tolls collected for passing freights and passengers through said canal and locks, which sum of ten per centum of net profits shall be paid into the common school fund of this State."

"The company did construct the canal and locks as provided for in said act, and the bonds for the said sum of $200,000 were issued and afterward paid. Thereafter that company operated the canal and locks and collected tolls therefor until March 8, 1876, and during that time paid to the State as net profits for the year 1873, $430, but made no other payments. On March 8, 1876, it assigned and transferred all of its interests in the canal and locks to the Willamette Transportation & Locks Co., which we shall hereafter refer to as the "second company." This second company thereafter operated the same until August 24, 1892, when it assigned and transferred its interests therein to this defendant, which has operated the same ever since.

The legislature on October 19, 1876 (Laws 1876, p. 14), passed an additional act, relating to the canal and locks, by Section 5 of which it created a board of canal commissioners consisting of three members and authorized them to appoint a secretary, whose duty it was to keep a register of the names of all water craft and of

the number of tons of freight and number of passengers passing through the locks, and also provided by other sections that no discriminations should be made by the company in passing boats or collecting tolls, requiring boatowners to furnish to the secretary of the board lists of the amount of freight and number of passengers carried through the locks, and requiring the board to certify to the Secretary of State the number of tons of freight and number of passengers passing through the locks, to the end that knowledge of the receipts of the said locks company may be authoritatively had, and that the first company, or the party claiming under it by virtue of assignment, shall certify to the Secretary of State a detailed and itemized statement of the disbursements and liabilities of the company, in order that the company's net receipts may be ascertained.

On October 17, 1878, another act (Laws 1878, p. 27) was passed by the legislature, amending Section 5 of the act of 1876 (Laws 1876, p. 16). This act provides that one commissioner shall be elected by the legislature, who, with the Governor and Secretary of State, shall constitute the board, and the elected commissioner shall be the secretary of said board.

On October 26, 1882, another act (Laws 1882, p. 42) was passed by the legislature, making the Governor, Secretary of State, and State Treasurer, the board of canal commissioners, and the private secretary of the Governor the secretary of the board, and requiring the first company, or the party acting under it, to certify quarterly to the board the number of tons of freight and the number of passengers, together with the names of craft, passing through the canal. This act repeals such sections of the acts of 1876 and 1878 as are thereby rendered inoperative.

It is alleged in the amended complaint that the defendant has refused and neglected to furnish a detailed and itemized statement of the disbursements, or a full and

complete statement of the freight and passengers pass-
ing through the canal and locks, or of the tolls collected
therefor, from which the net profits of the company may
be ascertained, and refuses and neglects to pay the said
10 per cent of such net profits to the State; and asks
that the defendant be required to furnish an account of
the expenses and of the freights and passengers passed
through the locks, and the tolls collected therefor, that
said net profits may be ascertained, and that the plain-
tiff have judgment for 10 per cent of said net profits from
and including the year 1874 to and including the year
1904.

The defendant demurred to all that part of the amended
complaint which seeks to recover from the defendant the
net profits earned prior to the 21st day of May, 1897, for
the reason that this suit therefor has not been com-
menced within the time limited by law.   The demurrer
was sustained by the lower court and entry thereof made
on January 2, 1906, and thereafter, on March 3, 1906,
the court rendered judgment dismissing the complaint,
so far as it seeks to recover any net profits arising
prior to the 21st day of May, 1897.   On April 3,
1906, the defendant filed his answer, wherein he denies
that the first company accepted the terms of the act of
1870, but admits that it accepted the bonds; denies on
information and belief the payment of $430, that the first
company or the second company made no other pay-
ments of the 10 per cent of the profits, or that the first
company or the second company operated the canal
and locks under the act of 1870 or the act of 1876;
also denies that any request was made upon this defend-
ant for a statement or for the payment of said 10 per
cent; and denies the legal effect of the statutes, and acts
set out in the complaint, and sets up three separate
affirmative defenses.   The effect of the first one is that
by the articles of incorporation of itself and predecessors,
and by mesne conveyances the defendant has acquired

the title and ownership of the canal and locks in fee, and not through any of these special statutes. By the second defense, after reciting its title as set forth in the first defense, it is alleged that, by reason of the fact that the State has acquiesced in the defendant's exercise of these rights and by virtue of the act of 1876, it is now estopped to claim anything against the defendant. The third defense, after alleging title as set forth in the first defense, and ownership of the locks in fee, alleges that the suit seeks to deprive defendent of property without due process of law. The State demurred to the new matter of the answer, which was overruled by the court, and, the State refusing to plead further, decree was rendered dismissing the suit. From this decree the State appeals, assigning as error the order of the court sustaining defendant's demurrer to a portion of the amended complaint and the order overruling plaintiff's demurrer to the answer. This is a sufficient statement of the pleadings to disclose the issues presented here.

REVERSED.

For appellant there was a brief and oral arguments by *Mr. Andrew M. Crawford,* Attorney General, and *Mr. William P. Lord.*

For respondent there was a brief and oral arguments by *Mr. Frederick V. Holman* and *Mr. Wirt Minor.*

MR. JUSTICE EAKIN delivered the opinion of the court.

1. Defendant insists that the plaintiff cannot now question the ruling on the demurrer to the amended complaint, for the reason that a judgment was rendered at that time dismissing so much of the pleading as related to the matter covered by the demurrer, and that more than six months had elapsed thereafter before the appeal was taken. A demurrer is a part of the proceeding by which a cause is put at issue, and the order sustaining it eliminates from the pleading the matter so demurred to.

2. No further order or judgment is required or effective for that purpose; and the ruling thereon may be reviewed upon appeal from the final decree or judgment, regardless of the time that may have elapsed since the entry thereof: Section 557, B. & C. Comp. This is clearly a proper interpretation of the statute relating thereto; and to hold otherwise would be to establish a very cumbersome and dilatory practice, as well as one burdensome to the courts.

3. This demurrer is anomalous in the fact that it is not directed to the complaint or a cause of action therein, but to only a part of the relief sought. The order sustaining it did not eliminate a paragraph or even a sentence thereof, but only determined that plaintiff was not entitled to all the relief he asked. Section 69, B. & C. Comp. provides that "it (the demurrer) may be taken to the whole complaint, or to any of the alleged causes of action stated therein."

4. It may be that this complaint contains matters that constitute several causes of suit, but it is, in fact, stated as one cause. If defendant desired to take advantage of that fact, it should have done so by motion to strike out the complaint, because it contains several causes of suit not separately stated under Section 106, B. & C. Comp.; but, not having done so, the error is waived, and the complaint must be treated as one cause of suit. The demurrer is not available to question any part of the pleading less than a cause of action or defense. Here it only attacks a part of the recovery sought, claiming that the prayer asks too much. This point is quite similar to the one decided in *Sunnyside L. Co.* v. *Bridge Ry. Co.* 20 Or. 544, 546 (26 Pac. 835, 836), in which Mr. Justice BEAN says:

"If the allegations of the complaint, in which plaintiff seeks to lay down the rule by which the damages are to be estimated, are insufficient or irrelevant, the defect cannot be reached by demurrer, so long as the other parts of the complaint contain a sufficient statement."

52 OR.— 17

5. Section 68, B. & C. Comp. provides that the defendant may demur to the complaint when it appears on the face thereof that the action has not been commenced within the time limited by this code; but the demurrer here does not come within that statute. It is admitted that there is a good cause stated for part of the claim, and the amount of the recovery is to be determined at the trial. However, both plaintiff and defendant, as well as the court below, have treated it as questioning the extent of plaintiff's right of recovery. And we shall so consider it.

6. The plaintiff insists that the statute of limitations does not apply to any part of the claim sought to be recovered, for the reason that by the act of 1870 (Laws 1870, p. 14) the State reserved a portion of the tolls to itself, to be collected by the company as the agent of the State, and that, when the company received the same, it did so in trust for the State, and that the statute in such a case does not commence to run until a demand is made or an accounting had; but we think the premise is wrong. The State did not reserve a portion of the tolls, but authorized the company to take the tolls and "pay to the State of Oregon 10 per cent of the net profits arising therefrom"—a per cent of what is left after the expenses are paid, which is not specific money, but an unknown quantity until the accounting is had and a balance ascertained. This is the holding in the case of *Railroad Co. v. Maryland,* 21 Wall. (U. S.) 456 (22 L. Ed. 678). There the statute reserved to the state one fifth of the gross receipts for fares on the railway, and the State claimed that even if the act was in violation of the United States Constitution, yet the money was received as a trust fund, collected by the company for the state, as its agent, and therefore it must account; but the court holds that "we cannot concur in the position that any part of the passenger money, when received by the

company, became or was the money of the state.  It was the money of the railroad company alone."

7. Counsel for plaintiff in their argument seek to make a distinction in the application of the statute of limitations to suits brought by the State in its sovereign capacity and to those involving contractual relations. This question is discussed in *Schneider* v. *Hutchinson,* 35 Or. 253 (57 Pac. 324: 76 Am. St. Rep. 474), in which the court hold that all suits by the State, whether brought in its sovereign or its proprietary capacity, are alike within the statute.  In this case the liability is for a debt —a charge upon the franchise against which the statute may run.  Prior to May 21, 1903, the statute of limitations applied to actions brought in the name of the State, the same as to those brought by private parties: Section 13, B. & C. Comp.  Therefore we conclude that the State is barred from recovering herein for any amounts accrued prior to May 21, 1897.

8. Defendant claims that the first company acquired its rights and franchises, by which it owned and operated the canal and locks, by virtue of the general statute of 1862, authorizing the organization of corporations, which is found at page 658 in the code of 1866, known as Deady's Code· (B. & C. Comp. §§ 5052-5075), and not by virtue of the act of 1870.  This is the principal point of contention between plaintiff and defendant; and we shall first consider the effect of the statute of 1862.  Section 4 thereof provides what the articles of incorporation shall specify, and Section 5 defines what the powers and authority of a corporation shall be; but neither of these sections grant any franchise other than the right to incorporate.  Sections 23 and 24 extend to the corporations therein mentioned, which include those organized for the construction of canals, the power to exercise the right of eminent domain.  This right is available or necessary only when a public interest is to be served, and when the exercise of the right of eminent domain is necessary

to enable the company to carry out the purpose of its organization: *Railroad Co.* v. *Maryland,* 21 Wall. (U. S.) 456 (22 L. Ed. 678). It does not transfer to such a corporation the title to, or the use of, any public property, rights, or easements.

9. It is maintained by defendant that Section 20 of this act, is a grant of the State's right in the public highway and the right to construct and operate the canal, as well as the right of eminent domain; but the only purpose of the first portion of that section is to enlarge the powers of corporations organized for purposes of navigation so as to authorize the construction of railroads or canals necessary to such navigation, as though that had been originally included in their articles, and nothing more. Its language is: "Any corporation formed for the purpose of navigating any stream or other water, may, by virtue of such incorporation, construct any * * canal * * necessary * * in like manner and with like effect as if such corporation had been specially formed for such purposes." Therefore no other right, power, or franchise is granted thereby to a corporation organized for such a purpose than is given by Section 23, viz., it confers the right of eminent domain for canal purposes upon a corporation whose charter is otherwise not broad enough to include it, and nothing more. Besides, that section relates only to corporations organized for navigation, and does not apply to the Willamette Falls Canal & Lock Co., as that is a corporation for construction, and is fully provided for by Section 23. But the construction and operation of a canal and locks as part of a navigable river, and the taking of tolls thereon are franchises that cannot be exercised without permission from the State.

10. A corporation may take advantage of the privileges and franchises granted by the general law of incorporation by including in its articles any of these privileges and franchises it may desire to exercise, and to that extent the articles stand as the legislative charter

of the company, but it cannot exercise powers or privi-
leges not enumerated therein, and can exercise no power
not authorized by the statute, even though enumerated
in its articles. "A corporation can exercise no power or
authority which is not granted to it by the charter under
which it exists, or by some other act of the legislature
which granted that charter": *Oregon Ry. Co.* v. *Orego-
nian Ry. Co.* 130 U. S. 1, 21 (9 Sup. Ct. 409: 32 L. Ed.
837). In such a case as this tolls are nowhere authorized
by the general statute: *Lansing* v. *Smith,* 4 Wend.
(N. Y.) 9 (21 Am. Dec. 89) ; 5 Am. & Eng. Enc. Law
(2 ed.) 117; *Toll Road Co.* v. *People ex rel.* 22 Colo. 429
(45 Pac. 398: 37 L. R. A. 711) ; *Winchester & L. T. R.
Co.* v. *Croxton,* 98 Ky. 739 (34 S. W. 518: 33 L. R. A.
177) ; *Perrine* v. *Chesapeake & D. C. Co.* 9 How. (U. S.)
171 (13 L. Ed. 92) ; *State* v. *Olcott,* 6 N. H. 74; *Olcott*
v. *Banfill,* 4 N. H. 537.

11. It is universally held that all grants of franchises
are to be strictly construed against the grantee. Noth-
ing passes by implication. Mr. Justice GRAY, in *Shively*
v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548: 38 L. Ed. 331),
quotes with approval from Sir William Scott: "All
grants of the crown are to be strictly construed against
the grantee, contrary to the usual policy of the law in
the consideration of grants; and upon this just ground,
that the prerogatives and rights and emoluments of the
crown being conferred upon it for great purposes, and
for the public use, it shall not be intended that such
prerogatives, rights, and emoluments are diminished by
any grant beyond what such grant by necessary and
unavoidable construction shall take away": *Charles
River Bridge* v. *Warren Bridge,* 11 Pet. (U. S.) 420
(9 L. Ed. 733, 938) ; *Oregon Ry. Co.* v. *Oregonian Ry.
Co.* 130 U. S. 1 (9 Sup. Ct. 409: 32 L. Ed. 837) ; *Turn-
pike Co.* v. *Illinois,* 96 U. S. 63 (24 L. Ed. 651) ; *Dubuque
& Pac. R. Co.* v. *Litchfield,* 23 How. (U. S.) 66 (16
L. Ed. 500).

12. It is maintained by defendant that the locks were constructed on land owned in fee by the first company, and that, by reason thereof, under its common-law right, it had the right to take tolls and also to transfer to whom it pleased; but such right does not apply in relation to franchises intended in a large measure to be exercised for the public service. Such an undertaking is one, the exercise of which belongs exclusively to the State, or to those to whom it may delegate it. It is not one of common right, and is subject in the hands of such delegated agent to any restricions that may be imposed by the State. In *Sturgeon Bay H. Co.* v. *Leatham,* 164 Ill. 239, 244 (45 N. E. 422, 424), the court, in discussing the power of corporations to take toll, quote from *Perrine* v. *Canal Co.* 9 How. (U. S.) 172 (13 L. Ed. 92), as follows: "A corporation created by statute is a mere creature of the law, and can exercise no powers except those which the law confers upon it, or which are incident to its existence. And as no power is given to this corporation to demand toll from passengers, or from vessels on account of the passengers on board, it is very clear that no such power can be exercised, and no such toll lawfully taken"—and then says: "Appellant's counsel insist that the appellant company is the owner of the canal, and has the common-law right of any owner to exact a compensation for the use of what belongs to it. This doctrine is not applicable here. The appellant corporation has no rights of property except those conferred by its charter, and can only exercise such rights of property as are necessary to effectuate the objects for which the legislature created it. 'Whether it may lawfully demand compensation from a person whom it permits to pass over its property must depend upon the language of its charter, and not upon the rules of the common law': *Perrine* v. *Canal Co.* 9 How. (U. S.) 172 (13 L. Ed. 92)."

13. In the case of *Perrine* v. *Canal Co.* cited in that opinion, in discussing this same question, it is said:

"Now it is the well-settled doctrine of this court that a corporation created by statute is a mere creature of the law, and can exercise no powers except those which the law confers upon it, or which are incident to its existence. * * The principle above stated is also an answer to the argument which places the right of the company to demand toll upon the ground that it is the absolute owner of the works and of the land it occupies, and insists that it may therefore, like any other owner, demand compensation from any person passing over its property. The error of this argument consists in regarding the title of the company to the property in question, as derived to them upon common-law principles, and measuring their rights by the rules of the common law. The corporation has no rights of property except those derived from the provisions of the charter, nor can it exercise any powers over the property it holds except those with which the charter has clothed it. It holds the property only for the purposes with which it was permitted to acquire it; that is, to effectuate the objects for which the legislature created it. And whether it may lawfully demand compensation from a person whom it permits to pass over its property must depend upon the language of the charter, and not upon the rules of the common law." See, also, *Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1 (9 Sup. Ct. 409: 32 L. Ed. 837) ; 2 Sutherland, Statutory Construction, § 549. Defendant's claim that the canal was built upon land which the first company owned in fee is not entirely correct. The upland owner bordering upon a navigable stream owns only to the high-water line. The river, and its banks and bed belong to the State: *Montgomery* v. *Shaver,* 40 Or. 244 (66 Pac. 923) ; *Wilson* v. *Welch,* 12 Or. 353 (7 Pac. 341) ; *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154) ; *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418) ; 4 Am. & Eng. Enc. Law (2 ed.), 825; 21 Am. & Eng.

Enc. Law (2 ed.), 436; *Railroad Co.* v. *Schurmeir,* 7 Wall. (U. S.) 272 (19 L. Ed. 74) ; *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548: 38 L. Ed. 331).

14. Although the answer here alleges ownership of the canal and locks in fee, the court will take notice of the fact that the predecessors of defendant could acquire rights in the bed, banks, or water of the river only by an act of the legislature; and, whether the locks are within the banks of the river or not, the canal at both ends must reach deep water. Thus it would seem to be very necessary for the defendant to claim its franchises through the act of 1870.

15. When the first company accepted the franchise to construct the canal and locks, and constructed them principally upon land which it owned in fee, such land thereby became a part of the highway to the same extent as it would have done if originally owned by a stranger and the company had acquired it by the exercise of the right of eminent domain. It was equivalent to a dedication to that extent: *Olcott* v. *Banfill et al.* 4 N. H. 537; *Toll Road Co.* v. *People ex rel.* 22 Colo. 429 (45 Pac. 398: 37 L. R. A. 711) ; Elliott, Roads & Streets, 54; 29 Am. & Eng. Enc. Law (2 ed.), 5.

16. And now looking at the special acts of 1870, 1876, 1878, and 1882, we find that by the preamble to the act of 1870 the first company was incorporated for the purpose of constructing a canal and locks, and that the State, by that act, appropriated to it the sum of $200,000 upon certain conditions; and every requirement imposed upon the company by the act was a condition of the appropriation and other rights granted. The act must be considered as an entirety. The corporation was organized only for the purpose of construction. Therefore, by its charter, it could not operate the locks, but by the act of 1870 it was authorized and required to construct and operate them, which enlarged its charter, and, by implication, included the right to appropriate

the bed and banks of the river, so far as needed, and to divert the water necessary for its purposes. In other words, it extended to the company the State's power and right to do these things. This act limited the rate of toll, and exacted a payment to the State of 10 per cent of the profits therefrom, thus impliedly authorizing the collection of tolls. Also it reserved the right, or exacted the condition, that the State, at the expiration of 20 years, should have the right to appropriate the canal and locks upon paying therefor. The preamble to the act of 1876 refers to the act of 1870 as granting "privileges, rights, and pecuniary aid," thus construing it as a franchise granting more than pecuniary aid, so that the act of 1870 became a part of the company's charter.

17. Again, as to the power of the first company to transfer its franchises, the grant was made to the first company with no power to transfer. Without such authority a transfer is void, and does not relieve the franchise of any of the burdens imposed by the act of its creation. These burdens are a charge upon the franchise, not upon the land as such, and may be enforced against the person or corporation exercising it: *State v. Northern Pac. Ry. Co.* 36 Minn. 207 (30 N. W. 663); *Railroad Co.* v. *Maryland,* 21 Wall. (U. S.) 456 (22 L. Ed. 678). This is the effect of the decision in *Lakin* v. *Railroad Co.* 13 Or. 436 (11 Pac. 68: 57 Am. Rep. 25), in which Mr. Justice LORD says: "A railroad corporation organized under it (the general law) has no authority, without the consent of the legislature, to lease its road, and that, when it has done so, it is responsible to the public for the manner of operating the road. As to the public, those operating it must be regarded as agents of the corporation." Where a corporation "has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from

performing those functions which undertakes, without the consent of the State, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void as against public policy": *Thomas* v. *Railroad Co.* 101 U. S. 71, 83 (25 L. Ed. 950). In *Railroad Co.* v. *Winans,* 17 How. (U. S.) 30, 39 (15 L. Ed. 27), it is said: "This conclusion [argument] implies that the duties imposed upon the plaintiff by the charter are fulfilled by the construction of the road, and that by aliènating its right to use, and its powers of control and supervision, it may avoid further responsibility. But those acts involve an overturn of the relations which the charter has arranged between the corporation and the community. Important franchises were conferred upon the corporation to enable it to provide the facilities to communication and intercourse required for the public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided, as a remuneration to the community for their grant. The corporation cannot absolve itself from the performance of its obligations without the consent of the legislature." In *Black* v. *Canal Co.* 22 N. J. Eq. 130, 399, the court say: "It may be considered as settled that a corporation cannot lose 'or alien any franchise or any property necessary to perform its obligations and duties to the State without legislative authority." See, also, *Toll Road Co.* v. *People ex rel.* 22 Colo. 429 (45 Pac. 398: 37 L. R. A. 711) ; *Penn. Co.* v. *St. Louis R.* 118 U. S. 290 (6 Sup. Ct. 1094: 30 L. Ed. 83) ; *Chicago Gaslight Co.* v. *People's Gaslight Co.* 121 Ill. 530 (13 N. E. 169) ; *Stewart's Appeal,* 56 Pa. 413. The right of a corporation to transfer its franchises was the only issue involved in *Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1 (9 Sup. Ct. 409: 32 L. Ed. 837), under the general statute of 1862, the one involved here,

and, after a thorough examination thereof, holds that it did not authorize a corporation to sell or lease its entire property, franchises, and powers to another company.

18. Counsel for defendant seem to claim something from the amendments of the act construed in that case: Deady's Gen. Laws, p. 659, c. 8, § 5. Section 5 thereof (B. & C. Comp. § 5056) was amended in 1878 (Laws 1878, p. 90, § 1) by adding to subdivision 4 a clause giving a corporation power to receive and dispose of property donated to it for the purpose of aiding the objects of such corporation, but has no reference to the disposition of its franchises. This section was again amended in 1887 (Laws 1887, p. 14, § 1) by adding subdivision 7, which relates only to railroads, and evidently for the purpose of avoiding the effect of the ruling in *Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1 (9 Sup. Ct. 409: 32 L. Ed. 837), and also in recognition of the fact that at that time a corporation could not transfer its franchise, and neither of these amendments aid defendant here, and the act of 1905, authorizing corporations to transfer their property and franchise, can have no bearing upon this case.

19. As to the legislative act of 1876, the first company transferred its interests to the second company on March 8, 1876, without the consent of the legislature, and on October 19, 1876, that body, evidently knowing of such transfer, and that the second company was a transportation company and would pass its own vessels through the locks, and that it was thus in a position both to discriminate against other boatowners and to defeat the State, provided by the act of that date against such discrimination, and created a board of canal commissioners to supervise these matters. It was provided that the secretary of this board should keep account of the freight and passengers passing through the locks, and that the boatowners, which would include the second company itself, should furnish to the secretary lists of

the amount of freight and the number of passengers, and also that the company operating the canal should furnish a detailed statement of expenses that the net profits might be ascertained.  The provisions of the act of 1870, although not re-enacted in this statute, are not repealed but remain intact, and it is very plain that the purpose of the act of 1876 was to put the State in a position to collect its 10 per cent of the net profits in addition to the other purposes above mentioned.  Section 18, p. 19, being the emergency clause, expressly states that, as there is a necessity for accurate records relating to the locks, the interests of the State therein should be represented, and that there is apprehension in the minds of the people as to the situation, making it important that the act take effect immediately.  This emergency clause aids us in understanding what was in the mind of the legislators when considering the measure.  It would seem from the whole act that language could hardly make it plainer, that its purpose was to aid in the enforcement of the legislative act of 1870, and for no other purpose.  It creates no additional burdens, and makes no change in the original liabilities and obligations of the first company.  The act studiously avoids recognizing the second company in terms, but refers to "any and every person, corporation, company, or agent for, or employee of, either having authoritative charge or control of, or owning or claiming to own, or having any interest in the Willamette Falls canal and locks," and "or any party claiming under said corporation by virtue of assignment."  If this may be considered as authorizing or recognizing the transfer, or consenting thereto, it is on condition that the second company shall stand in the place of the first company and bear the burdens of the act of 1870.  At any rate, it cannot be construed as recognizing a transfer free from those obligations.  The acts of 1878 and 1882 contain provisions only to lessen expense to the State and to aid it in secur-

ing the fulfillment of the terms of the act of 1870, and do
not ignore but emphasize them.

In *Thomas* v. *Railroad Co.* 101 U. S. 71 (25 L. Ed.
950), a lease had been made, and thereafter the legisla-
ture passed an act in which it referred to the company
or its "lessees"; and this was held not to be a ratification
of the lease. In *Oregon Ry. Co.* v. *Oregonian Ry. Co.*
130 U: S. 1 (9 Sup. Ct. 409: 32 L. Ed. 837), the effect
of a special act of the legislature of Oregon, granting
certain privileges to a corporation and to its "successors
and assigns" (Laws 1880, p. 56) was under considera-
tion, which it was claimed authorized a transfer or lease
by the defendant. But it was held that it could not be so
construed. Even if this transfer be recognized as effec-
tive to pass the title, yet, when the second company
purchased the canal and locks, it was the purchase of a
franchise—a creation of the legislature—and must be
accepted as created with its privileges, but also subject
to its burdens. 2 Rorer, Railroads, 882, says: "It is
merely the purchase of a privilege of being subrogated
to and recognized by the State as the corporate entity
in lieu of the original corporators, and the terms of the
old charter become those of the new by legal enactment
without a repetition of the words." Such was held to be
the effect of a transfer in *State* v. *Northern Pac. Ry.*
36 Minn. 207 (30 N. W. 663), where the assignee was
required to pay the percentage of earnings provided in
the charter of the original company. Also in *Mayor* v.
*Twenty-Third St. R. Co.* 113 N. Y. 311 (21 N. E. 60), a
provision of a special act of the legislature modified the
liability of the company under the general statute. This
provision was held to be an amendment of the charter,
and, as in the case before us, required the company to
pay to the city 1 per cent of the gross receipts of the
road. By authority of a special act of the legislature,
the original company leased the road to the defendant
for 99 years. But neither by the lease nor by the terms

of the statute was it expressly required to pay the 1 per cent of earnings; and the court say it was a charter obligation. "The entity called a corporation, consists of the sum total of all its charter powers and rights, and all its charter obligations and duties; and such powers and rights cannot be effectually'divorced from such obligations and duties. The latter are correlatives to the former, and constitute the consideration for the corporate franchises, and their performance may be exacted as a condition of corporate existence. Hence, when the defendant took the property, rights, privileges, and franchises of the Bleecker Street & Fulton Ferry Railroad Co. it took them burdened with its charter obligations." See, also, *Harmon* v. *Columbia & G. R. Co.* 28 S. C. 401 (5 S. E. 835: 13 Am. Rep. 686).

20. A franchise does not involve an interest in land. It is not real estate, but a privilege which may be owned without the acquisition of real property at all. The use of a franchise may require the occupancy or even the ownership of land, but that circumstance does not make the franchise itself an interest in land. A franchise is (1) an incorporeal hereditament; and (2) a privilege or authority vested in certain persons by grant of the State to exercise powers or to do and perform acts which, without such grant, they could not do or perform. A franchise consists in the incorporeal right. The property acquired is not the franchise: *Consolidated Gas Co.* v. *Mayor, etc.* 101 Md. 541 (61 Atl. 532: 1 L. R. A. (N. S.) 263: 109 Am. St. Rep. 584). The first company could not transfer its franchise free from its burdens, nor could the transferee company avoid liability, even though in its purchase it did not expressly assume the burdens. The cases cited make it plain, that the burden is upon the franchise, and not dependent on any theory of a lien or covenant running with the land: *Chicago, R. I. Ry. Co.* v. *Zernecke,* 183 U. S. 582 (22 Sup. Ct.

229: 46 L. Ed. 339) ; *Railroad Co.* v. *Maryland*, 21 Wall. (U. S.) 456 (22 L. Ed. 678).

21. The second and third defenses of the answer are based largely upon the legislative acts of 1870 and 1876 as viewed from defendant's standpoint; but our interpretation thereof in this opinion practically disposes of these defenses.  The second defense is to the effect that the State is estopped from asserting its claim by reason of the provisions of the act of 1876 in acquiescing in the transfer by the first company to the second company, and as equivalent to an abandonment by the State of the provisions of the act of 1870, and also by reason of its acquiescence in defendant's ownership, and laches in enforcing its claim.  As we have seen, the legislature did not by the act of 1876 approve or recognize the assignment by the first company to the second company, or to any extent waive the benefits arising under the act of 1870, but rather made them more secure by that act; and, therefore it constitutes no foundation for estoppel. The only acquiesence by the State in plaintiff's purchase and improvements of the locks claimed by defendant is the inaction of its officers, principally in that they did not collect the 10 per cent of the profits.  But the laches of the officers of the State in collecting installments due cannot operate as a waiver of a continuing liability for a share of the profits or a recognition of defendant's ownership free from it: *United States* v. *Kirpatrick*, 9 Wheat. (U. S.) 720 (6 L. Ed. 199).

22. Neither can it be construed as silence by the State when it ought to speak. Estoppels *in pais* against the State will not arise from the laches of its officers: 16 Cyc. 780; *State ex rel. Lott* v. *Brewer*, 64 Ala. 287. The cases of *City of Bradford* v. *Tel. & Tel. Co.* 206 Pa. 582 (56 Atl. 41) ; *Commonwealth* v. *Turnpike Co.* 153 Pa. 47 (25 Atl. 1105) ; *Penn. R. Co.* v. *Montgomery Co. Pass Ry.* 167 Pa. 62 (31 Atl. 468: 27 L. R. A. 766: 46 Am. Rep. 659), and other cases cited by defendant

upon this point, relate to acquiescence by the State or municipality in appropriation by a corporation of streets for railway purposes, and are not in point upon the question here.

23. The purchase by the second company or by this defendant was not inconsistent with, or adverse to, any interest of the State that required the State to act. There was no apparent attempt to transfer any interest of the State. It had a right to assume that the purchaser would fulfill the obligations of the first company. To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it: Bigelow, Estoppel (5 ed.), 569, 570.

24. The conduct complained of here is that plaintiff stood by and saw its rights interfered with; that is, was silent when it was its duty to speak: 16 Cyc. 759, 770. There are several answers to this claim: First, the plaintiff's right as to the share of the profits was not being questioned, no mention was made of it in the transfer, nor was the transfer inconsistent therewith. The officers of the State had no power or authority to hold out to the defendant that the State would consent to the transfer or waive any right. The defendant knew the facts, and gave the State no intimation that it was intending to deny the State's right to a share of the profits; so that the answer does not allege facts sufficient to constitute an estoppel against the State.

25. The third defense of the answer is that plaintiff seeks to take the property of defendant without due process of law, in violation of Article XIV of the Constitution of the United States, and also is based upon defendant's alleged fee-simple title to the canal and locks independent of and free from any burdens imposed by

the act of 1870; but, as we have already shown, the defendant acquired the property subject to these burdens, and therefore the enforcement of them is no violation of the constitutional provision relied on.

26. It is urged by defendant that the title of the act of 1870 is not broad enough to authorize the provision of Section 5 thereof, which provides for payment to the State of 10 per cent of the net profits of the tolls, as a condition upon which the grant is made, within the provisions of Article IV, Section 20, Constitution Oregon, which provides that "every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title." But this condition of Section 5 is clearly a matter "properly connected" with the subject of the act. It is the condition upon which the grant is made, with a view to partial compensation to the State for the grant. It certainly is not foreign to the subject.

27. It is said by Mr. Justice BEAN in *State* v. *Shaw*, 22 Or. 287 (29 Pac. 1028) : "To be fatal, the departure from the title must be plain and manifest, and all doubts will be resolved in favor of the law. If all the provisions of the law relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unconstitutional as in violation of this clause of the constitution. * * This clause is not violated by any legislative act having various details properly pertinent and germane to one general object." To the same effect is the opinion of Mr. Chief Justice LORD, in *State* v. *Koshland,* 25 Or. 178 (35 Pac. 32), and he says : "If the matters embraced in the act are congruous, and have a proper relation to each other, and are not foreign to the subject expressed in the title, the requirements of the provision are not violated." See, also, *Ex parte Howe,* 26 Or. 181 (37 Pac. 536). The title to this act contemplates the construction of the canal and locks, and the

act may properly embrace provisions for its operation, including compensation to the State, and is not obnoxious to this clause of the constitution within the rules above quoted.

28. However, the first company accepted the provisions and benefits of the act of 1870 and acted upon it for several years, and cannot be heard to question its validity: *Corey* v. *Eastman,* 166 Mass. 279 (44 N. E. 217: 55 Am. Rep. 401) ; *Ashley* v. *Ryan,* 153 U. S. 436 (14 Sup. Ct. 865: 38 L. Ed. 773) ; *Daniels* v. *Tearney,* 102 U. S. 415 (26 L. Ed. 187) ; *Chicago, R. I. Ry. Co.* v. *Zernecke,* 183 U. S. 582 (22 Sup. Ct. 229: 46 L. Ed. 339) ; *De Lamar's Nev. G. M. Co.* v. *Nesbitt,* 177 U. S. 523 (20 Sup. Ct. 715: 44 L. Ed. 872).

29. Since the defendant has acquired from the first company what rights it now enjoys, and can occupy no better position as against the State than it did, defendant is also estopped from questioning the validity of the act of 1870: *Mayor* v. *M. Ry. Co.* 143 N. Y. 1 (37 N. E. 494) ; *Mayor* v. *Twenty-Third St. Ry. Co.* 113 N. Y. 311 (21 N. E. 60).

Therefore the decree is reversed and remanded, with instructions to sustain the demurrer as to each defense of the answer, and for such further proceedings as may be proper.                                             REVERSED.

---

Rehearing denied November 8, 1908.

## ON PETITION FOR REHEARING.

[98 Pac. 160.]

MR. JUSTICE EAKIN delivered the opinion of the court.

30. It is suggested, by the petition for rehearing, that the court is not justified in holding that Act 1870 (Laws 1870, p. 14) authorized the construction of the locks, and gave authority to operate them and collect tolls thereon, and that the first company did not have these powers and rights by virtue of its articles of incorporation. The Willamette River is a public navigable stream, a public highway, the title to the bed and banks of which

is in the State, for the benefit of the public: *Johnson* v. *Knott*, 13 Or. 308 (10 Pac. 418) ; *Pollard's Lessee* v. *Hagan*, 3 How. 212, 219 (11 L. Ed. 565) ; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272 (19 L. Ed. 74).

31. The State has the right to improve this highway for the purpose of navigation. It may do this itself, or it may delegate to another the authority to do so.

32. But without this delegated authority from the State, no company can acquire the right, by filing articles of incorporation, either to improve it or to collect tolls for the use of such improvements, even when such a purpose is specified in those articles: 21 Am. & Eng. Enc. Law (2 ed.), 434b, and authorities cited; 29 Cyc. 298, 304. In *Boykin v. Shaffer*, 13 La. Ann. 128, 131, in discussing the right to collect tolls upon a navigable stream, the court say: "It must be considered that the defendant could not without authority, charge toll for the use of a lock which he had erected. Such a right would be a franchise which the sovereign alone could confer." See, also, *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 329 (13 Sup. Ct. 622: 37 L. Ed. 463) ; *Sands* v. *Manistee R. Imp. Co.* 123 U. S. 288 (8 Sup. Ct. 113: 31 L. Ed. 149).

33. The right to improve such a highway is a franchise that, unless authorized by the general statutes under which the corporation is organized, is not acquired by the act of incorporation. There must be authority from the State.

34. This answers the objection also, that the act of 1870 is an amendment to the articles of incorporation of the first company. It is a special grant of a franchise, one which could not be acquired by the specification thereof in the articles, and is not the creation of a corporation by a special law, which is forbidden by the constitution.

35. Section 2 of the act of 1870 provides that "in order to entitle the said corporation to receive the sum of

money hereby agreed to be paid, it shall be the duty of said corporation to construct a canal and locks. * * And after the completion of the same, the said corporation shall pass without delay * * all steamboats," etc. The term "duty to construct" is more comprehensive than a grant of authority, and includes it; and to say that the company "shall not charge a greater rate of toll than 50 cents per ton" is equivalent to saying that it may charge that much. A court probably would not hesitate so to construe it against the State, if it were denying that the company had such authority. The railroad cases cited by the counsel for defendant, to the effect that a charter to construct and operate the railroad carries with it the right to charge fares and freights, are hardly in point. The railroad company is the exclusive owner of the transportation line. It is a private road, the operation of which is for the purpose of rendering public service; but, to use an illustration suggested by the judge, in *Boykin* v. *Shaffer*, 13 La. Ann. 129, 131, if a company filed articles of incorporation for the purpose of building a bridge on a public highway where one may be needed, it could hardly be urged that it could control the bridge or collect tolls thereon without some authority from the county.

36. Counsel refer to the ferry franchise in the case of *Multnomah County* v. *Knott*, 6 Or. 279; but no corporation, by virtue of its articles of incorporation, could acquire a ferry franchise. It must be acquired by special grant, unless there is a general statute covering such a case.

37. And these provisons of the act of 1870 are not in violation of Constitution, Article XI, Section 2. To use counsel's own words, at page 29 of the petition: "There is no prohibition in the Oregon constitution against granting a franchise to operate a ferry or a canal or locks, and to collect tolls." Counsel say that by the answer it is alleged that the defendant is the owner in

fee of the canal and locks, and that for the purposes of
the demurrer this must be taken as true; but the court
will take judicial knowledge of the fact that the defend-
ant could acquire the fee to the property only by a legis-
lative grant.  It could not be acquired in any other way;
and therefore the allegation cannot.be taken as true.

38.  Counsel also insists that, by reason of the defend-
ant being the owner of the upland, he owns to the middle
of the stream, citing *Weiss* v. *Oregon Iron & Steel Co.*
13 Or. 496 (11 Pac. 255).  In that case the only holdinᵣ
is that Weiss was a riparian owner; not that he owned
the bed of the stream.  That case is cited to this effect
by Mr. Chief Justice BEAN in *Johnson* v. *Tomlinson*,
41 Or. 198, 200 (68 Pac. 406), where he says: "Under
the law as settled in this State, where a stream is
intended to be meandered by public surveys, the stream,
and not the actual meander line as run on the ground,
is the true boundary of the riparian owner: *Minto* v.
*Delaney*, 7 Or. 337; *Weiss* v. *Oregon I. & S. Co.* 13 Or.
496 (11 Pac. 255) ; *French Glenn L. S. Co.* v. *Springer*,
35 Or. 312 (58 Pac. 102).  It is stipulated and agreed
that plaintiff is the owner of a certain described portion
of lot 10, and as a consequence it necessarily follows
from the rule stated that his title is not confined to the
meander line, but extends to the stream, and includes all
of the upland, if any, between the meander line and the
line of ordinary high water."  It is held in *Johnson* v.
*Knott,* 13 Or. 308 (10 Pac. 418), citing *Railroad Co.* v.
*Schurmeir,* 7 Wall. 272 (19 L. Ed. 74), that the point to
which the water usually rises, in an ordinary season of
high water, is the meander line, and that this line forms
the boundary of the title of the United States.

39.  This question is settled in *Montgomery* v. *Shaver,*
40 Or. 244, 247 (66 Pac. 923, 924), as follows: "It is
suggested that the shore owner of uplands takes to low-
water instead of ordinary high-water mark, but the rule
to the contrary has been so firmly established. in this

jurisdiction, that it is unnecessary to treat the question further than to cite the cases in which it was involved: *Parker* v. *Taylor,* 7 Or. 435; *Wilson* v. *Welch,* 12 Or. 353 (7 Pac. 341); *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418); *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154); *Astoria Exchange Co.* v. *Shively,* 27 Or. 104 (39 Pac. 398: 40 Pac. 92); *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548: 38 L. Ed. 331)."

40. The articles of incorporation of the defendant created in it no new or independent franchise on the river. They only put the defendant in a position to succeed to the franchises of the second company; and, when it took over those franchises, it took them with just such burdens as were upon them in the hands of the first and second companies. Its articles of incorporation gave it no new or additional rights, nor in any manner enlarged the franchises.

41. The validity of this act of 1870 does not depend upon the legislative authority to appropriate to the school fund the 10 per cent of the net profits. If the legislature had no such power, that does not detract from its authority to exact a share of the profits of the canal and locks as a burden upon the franchises. Section 5 of the act provides that the company shall pay to the State this 10 per cent; and the questions here involved have nothing to do with the State's disposition of the money when paid. These questions, as well as others mentioned in the petition, we deem fully answered by the opinion, to which we adhere.

The petition is denied.

Reversed : Rehearing Denied.